UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                          :

GLOBAL REINSURANCE CORPORATION   :
OF AMERICA,   :
                                      :
                    Plaintiff,   :
                                        :
          -against-   :
                                        :
CENTURY INDEMNITY COMPANY,   :
                                        :
                    Defendant.   :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

13 Civ. 6577 (LGS)

**OPINION & ORDER**

LORNA G. SCHOFIELD, District Judge:

      This is a contract interpretation dispute between Plaintiff Global Reinsurance Corporation of America ("Global") and Defendant Century Indemnity Company ("Century"). Global seeks a declaratory judgment that the dollar amount stated in certain facultative reinsurance certificates is the maximum that Global must pay on each reinsurance contract. Century contends that the dollar amount stated in the certificates caps Global's indemnity payments but does not cap Global's obligation to pay defense costs.

      For the reasons stated below, the plain and unambiguous meaning of the reinsurance contracts is that the dollar amount stated on the facultative certificates caps indemnity payments and also caps expense payments when there are no losses, but does not cap expense payments when there are losses.

## I. PROCEDURAL HISTORY

      In 2014, Global's motion for summary judgment on this question was granted. *See Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, No. 13 Civ. 6577, 2014 WL 4054260 (S.D.N.Y. Aug. 15, 2014) (*Global I*). The decision relied primarily on *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910 (2d Cir. 1990). *Bellefonte* affirmed a judgment

declaring that reinsurers "[are] not obligated to pay . . . any additional sums for defense costs over and above the limits on liability stated in the reinsurance certificates." *Id*. at 910. The reinsurance documents in *Bellefonte* contained substantially similar language to the reinsurance documents here. *See Global I*, 2014 WL 4054260, at *5 ("Here, the relevant language in Global's Certificates is nearly identical to the language relied on by the Second Circuit in *Bellefonte*"). *Global I* also relied on *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1993). In *Unigard*, the reinsurance insured a portion of the risk assumed by another insurer on underlying insurance policies. Those underlying policies paid expenses above and beyond the limits for loss, which is the same as the underlying Century insurance policies here. In *Unigard*, the Second Circuit applied *Bellefonte* to conclude that a reinsurer is "not liable for expenses beyond the stated liability limit in the [c]ertificate." *Id*. at 1070-71. In this case, Century filed a motion for reconsideration of the grant of summary judgment to Global. The reconsideration motion was denied. *See Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, No. 13 Civ. 6577, 2015 WL 1782206 (S.D.N.Y. Apr. 15, 2015) (*Global II*).

On appeal, the Second Circuit cast doubt on the continued force of *Bellefonte* and *Unigard*. *See Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 843 F.3d 120, 126 (2d Cir. 2016) (*Global III*) (noting that objections to *Bellefonte* and *Unigard* were "worthy of reflection"). *Global III* emphasized that neither *Bellefonte* nor *Unigard* explained why the amount stated on a reinsurance certificate is a liability limit. *See id*. at 125 ("Significantly [in *Bellefonte*], although we described the amount stated in the 'Reinsurance Accepted' provision [of the certificate] as an 'explicit limitation on liability,' [*Bellefonte*, 903 F.2d] at 912, we never explained why this was so."); 125 n.6 ("Again, in *Unigard*, we described the amounts stated in the certificates as 'limits' on liability, though we did not explain why this was so."). Instead of

reaching a decision, the panel certified the following question to the New York Court of Appeals: whether New York contract law "impose[s] either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses." *Id*. at 122.

The New York Court of Appeals held that no rule or strong presumption exists and that courts instead must use "the traditional rules of contract interpretation" to interpret reinsurance contract provisions. *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 30 N.Y.3d 508, 518 (2017) (*Global IV*). In light of *Global IV*, the Second Circuit remanded and directed this Court to "construe each reinsurance policy solely in light of its language, and to the extent helpful, specific context." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 890 F.3d 74, 77 (2d Cir. 2018) (*Global V*).

Accordingly, this Court held an evidentiary hearing to determine (1) whether the language of the reinsurance contracts here is ambiguous and (2) whether and how industry specific context helps interpret the reinsurance contracts. *See* ECF 1:13-cv-6577, Dkt No. 161; *see also Sompo Japan Ins. Co. of Am. v. Norfolk Southern Ry. Co.*, 762 F.3d 165, 180 (2d Cir. 2014) ("Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance.").

## II.   FINDINGS OF FACT

The following facts are taken from the parties' joint statement of facts, undisputed declarations and expert testimony.

### A. The Reinsurance Market

Reinsurance is insurance that insurers purchase. In this case, Global is the reinsurer, as successor-in-interest to Constitution Reinsurance Corporation. Century is the insurer, or "cedent," as successor-in-interest to Insurance Company of America. This opinion uses the terms "Global" and "Century" to refer respectively either to those companies or their predecessors-in-interest.

This case is about facultative reinsurance, which is the reinsurance of a single underlying insurance policy. The cedent cedes, and the reinsurer accepts, all or part of the risk under that policy, and the reinsurer has the "faculty" to accept or reject the risk with respect to any policy on an individual basis. This is in contrast to "treaty" reinsurance, where the cedent cedes and the reinsurer assumes a portion of risk for numerous insurance policies issued by the cedent to different policyholders covering an entire class of risks. Treaty reinsurance forms the backbone of an insurer's reinsurance program and, as experts for both Global and Century agreed, "focusing on facultative reinsurance in isolation ignores the broader context of reinsurance structuring."

In the 1970's facultative reinsurance typically was documented in a "facultative certificate," which was usually a one-page, two-sided form drafted by the reinsurer. The front of the form typically contained "declarations," and the back of the form typically contained the reinsurance "terms and conditions." Reinsurance was and still is unregulated as to rate and form, and the cedent and reinsurer are free to accept, modify or reject terms, conditions and premiums.

The commercial insurance that reinsurance covers is often written in layers. For instance, a commercial insured may have a $1 million primary layer, a first excess layer of $4 million in excess of the $1 million, and then a $10 million excess of $5 million layer of insurance for a total

of $15 million in coverage. Each layer above the first responds when the limit(s) of the underlying layer(s) is exhausted. The reinsurance at issue here covers one or several of the excess layers.

A single reinsurer often does not provide coverage for an entire layer. Instead, a reinsurer typically provides coverage along with other reinsurers to "fill" a layer. For instance, a reinsurer could sell reinsurance to cover $1 million that is part of a $4 million layer in excess of a $1 million primary layer. In such a case, the reinsurer's obligation triggers only when the primary layer is exhausted, and the reinsurer's obligation includes reinsuring only a part of (25%) the $4 million excess layer. One or several other reinsurers could fill the remainder of the layer, a process often facilitated by intermediate brokerage companies that negotiate terms for the reinsurers. The reinsurance at issue here does not cover an entire excess layer, but just a part of the layer along with policies from other reinsurers.

### B. The Century Insurance Policies and the Global Reinsurance Policies

Between 1962 and 1981, Century issued insurance policies to Caterpillar Tractor Company ("Caterpillar") that obligated Century to pay for loss incurred by Caterpillar as a result of third-party liability claims up to each insurance policy's stated liability limit (the "Century Policies"). The Century Policies contain a separate "Supplementary Payments" provision, which requires Century to pay defense costs in addition to the applicable limit of liability for indemnity payments (*i.e.*, loss settlements/payments). In other words, defense cost payments do not "erode" the policy limits.

Between 1971 and 1980, Global sold facultative reinsurance to Century to reinsure the Century Policies. The facultative certificates include four provisions that are highly relevant to this dispute.[1]

An introductory paragraph (the "Preamble") in the facultative reinsurance certificates contains Global's general promise to reinsure. In eight of the ten certificates, it immediately precedes the terms and conditions. In the remaining two certificates it is at the very beginning of the certificate. The provision states:

> In consideration of the payment of the premium, and subject to the terms, conditions and limits of liability set forth herein and in the Declarations made a part hereof, the Reinsurer [Global] does hereby reinsure the ceding company [Century] named in the Declarations (herein called the Company) in respect of the Company's policy(ies) as follows:

The second highly relevant provision is Item 4 of the Declarations, entitled "Reinsurance Accepted." Item 4 identifies the layer of reinsurance in which Global participates and the part of that layer Global's reinsurance covers. In one certificate, Item 4 states: "$1,000,000 each occurrence and in the aggregate where applicable part of $10,000,000 which is in turn excess of the limits as stated in Item #3 above." Here, the layer is $10 million excess the amount stated in Item 3 of the Declarations, and Global's coverage obligation is $1 million part of the $10 million layer.[2]

Third is the "Following Form Clause," included in the first paragraph (Paragraph A) of the certificate's terms and conditions. It further defines Global's liability and states:

> The liability of the Reinsurer, as specified in Item 4 of the Declarations, shall follow that of the Company and shall be subject in all respects to all the terms and

---

[1] The language in the separate facultative certificates and in the underlying insurance policies is not identical. However, the parties stipulated that the differences in the language are not material. The terms and conditions in Certificate No. 62497 and its Endorsements are used here.

[2] "Each occurrence and in the aggregate" refers to per occurrence and aggregate limits, which are not relevant to the current dispute.

conditions of the Company's policy except when otherwise specifically provided herein or designated as non-concurrent reinsurance in the Declarations.

The final highly relevant provision is the "Payments Provision," in Paragraph D of the terms and conditions.[3] It provides how to determine Global's payment obligations when Century submits a claim for payment to Global. It states:

> All loss settlements made by the Company, provided they are within the terms and conditions of the original policy(ies) and within the terms and conditions of the certificate of reinsurance, shall be binding on the Reinsurer. Upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of such loss as set forth in the Declarations. In addition thereto, the Reinsurer shall pay its proportion of expenses [agreed by the parties in this case to include defense costs] . . . incurred by the Company in the investigation and settlement of claims or suits and its proportion of court costs and interest on any judgment or award, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment. If there is no loss payment, the Reinsurer shall pay its proportion of such expenses only in respect of business accepted on a contributing excess basis and then only in the percentage stated in Item 4 of the declarations in the first layer of participation.[4]

### C. The Evidentiary Hearing

For the hearing, Century submitted four expert witness statements as direct testimony ("Century Experts"), and Global submitted two as direct testimony ("Global Experts"). Three Century Experts were cross-examined, as were both Global Experts. In sum, the Century Experts testified that the facultative reinsurance certificates at issue here do not cap Global's obligation to pay expenses at the dollar amount stated in Item 4, while the Global Experts testified that Item 4 is a limit on indemnity and expenses combined that Global owes under the reinsurance agreements.

---

[3] The parties refer to this language in the facultative certificate as the "Loss Settlements Provision." The Opinion refers to this language as the "Payments Provision" because the provision explains how to determine Global's payment obligations for both losses and expenses.
[4] The parties agree that the phrase "expenses . . . incurred in the investigation and settlement of claims or suits and . . . court costs and interest on any judgment or reward" include litigation defense costs. *See* ECF 1:13-cv-6577, Dkt No. 224 at 59:22-61:10; Dkt No. 226 at 198:11-20.

The expert opinions for both parties are based on the text of the reinsurance certificates and industry custom and practice. The Century Experts contend that industry custom and practice clarifies the unambiguous specialized meaning of the reinsurance agreements within the 1970's reinsurance industry, while the Global Experts contend that no terms in the facultative certificates have a specialized meaning. *See Sompo Japan Ins. Co.*, 762 F.3d at 180 ("Terms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry."); *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., et al.*, 197 F. Supp. 3d 616, 623-24 (S.D.N.Y. 2016) (noting that "evidence of custom and usage is properly considered prior to the evaluation of extrinsic evidence" and determining, based on custom and usage, that a contract's reference to customers "unambiguously encompass[es]," retail investors).

### 1. The Century Experts

The Century Experts testified that knowledgeable members of the 1970's reinsurance industry would expect Global to pay expenses based on its proportionate participation in a layer of coverage in addition to the limit applicable to indemnity payments stated in Item 4.

This opinion is based in part on the language of the reinsurance agreement. To the Century Experts, the facultative certificates were drafted so that the terms and conditions of the underlying insurance were the same as -- or "concurrent" with -- the reinsurance. Therefore, because the Century Policies provide that the insurer must pay expenses in addition to indemnity, the reinsurer must as well. This "presumption of concurrency," they contend, is drafted into the reinsurance agreement through the Following Form Clause and Payments Provision, and can be rebutted only by an explicit textual directive, which does not exist here.

According to the Century Experts, knowledgeable members of the reinsurance industry understood "follow" -- as stated in the Following Form Clause ("[t]he liability of the Reinsurer,

as specified in Item 4 of the Declarations, shall follow that of the Company") -- to mean that the reinsurer must respond to the claims and expenses (such as defense costs) in the same way, albeit proportionally, as the insurer.  The Century Experts explained that the Following Form Clause efficiently adopts for the reinsurance the terms and conditions of the insurance without having to draft additional language, which could cause errors or inconsistencies in coverage.  They explained that the Following Form Clause includes broad language -- namely, "in all respects to all the terms and conditions of the Company's policy" -- to ensure that all of the insurance policy's terms and conditions apply to the reinsurance.  And they explained that the Following Form Clause states that the insurance policy's terms and conditions apply "except when otherwise specifically provided herein or designated as non-concurrent reinsurance in the Declarations" because the presumption is that all of the insurance policy's terms and conditions apply to the reinsurance.

The Century Experts described how, in their opinion, the Payments Provision determines the reinsurer's payment obligations.  The Payments Provision states in the first two sentences that the reinsurer must pay its share of the cedent's total losses based on the proportion in Item 4. The third sentence provides the types of expenses the reinsurer owes "in addition thereto" when losses are owed and that the reinsurer's share of expenses is based on a proportionate share of losses.  And the final sentence states the types of expenses the reinsurer owes when there are no losses and that the reinsurer's share of these expenses is based on the percentage of the reinsurer's participation in the layer, as stated in Item 4.

The Century Experts also claim to base their opinions on industry custom and practice during the 1970's.  To them, the principle of concurrency was so fundamental to facultative reinsurance in this context that no other interpretation of the reinsurance contracts is reasonable.

The Century Experts explained that concurrency has been essential to facultative reinsurance since its origins. When facultative reinsurance was first issued in European marine markets, it was documented through placement slips that simply noted that the terms of the reinsurance were subject to the conditions of the insurance. This historical practice of concurrency was formalized into facultative certificates with the Following Form Clause.

The Century Experts also emphasized that the reinsurance market in the 1970's made sense only if a widespread presumption of concurrency existed. They explained that if the insurance and reinsurance are non-concurrent as to expenses, there could be gaps in coverage that cascade across the layers of reinsurance and lead to high costs for the insurer without any corresponding premium. They noted that no insurer or broker would accept reinsurance that offered non-concurrent coverage as to expenses because the non-concurrent reinsurer would bear less risk and provide less coverage for the same premium. And they showed how, in a competitive reinsurance market, where the objective is to protect against catastrophic losses, it made no sense for an insurer to accept non-concurrent coverage as to expenses.

## 2. The Global Experts

The Global Experts testified that the reinsurance agreements at issue plainly cap all of Global's payment obligations at the dollar amount stated in Item 4 and that there was no custom and practice in the 1970's reinsurance industry that would warrant a different construction of the text. Their textual interpretation is based on the Preamble and Item 4. The Preamble states that the reinsurance is "subject to the terms, conditions and limits of liability set forth herein." The only limit on the certificate is stated in Item 4, and this precise dollar amount does not distinguish between losses and expenses. Accordingly, this dollar amount is the limit on losses and expenses combined.

The Global Experts asserted that there was no widespread understanding about the central importance of concurrency to facultative reinsurance in the 1970's (or today) and that insurers and reinsurers agreed to buy or sell facultative reinsurance for diverse reasons. Insurers often obtained facultative reinsurance to "inure to the benefit of" their treaty reinsurance, covering some of the same risks as the treaty and acting first on losses so that treaty premiums were not impacted. Alternatively, insurers purchased facultative certificates to cover risks that the treaty reinsurance did not cover and could selectively choose or negotiate facultative reinsurance with favorable terms and conditions, such as whether the reinsurance was non-concurrent as to expenses. The Global Experts also noted that claims generating substantial expenses above the reinsurance accepted limits had not yet emerged in the reinsurance and insurance industry in the 1970's so there was no basis for an industry custom and practice to develop as to the concurrency of reinsurers' liability for expenses.

### 3. Rebuttal Expert Opinions

The Century Experts and Global Experts disagreed regarding custom and practice in the 1970's reinsurance industry. As described above, the Global Experts opined that there was no custom and practice in the industry at that time that would require a different construction of the text than their own. They also directly denied that a presumption of concurrency existed or was necessary for the reinsurance market to make sense. The Century Experts stated in rebuttal that members of the reinsurance industry were aware that claims could generate substantial expenses and downplayed the significance of alternative reasons to purchase facultative reinsurance.

The parties' experts also disagreed about the proper interpretation of the reinsurance text. As to the Following Form Clause, the Global Experts stated first that the clause addresses only the types of risk coverage, not the liability limit. But even if the clause also addresses limits, the

Global experts contended that the Preamble expressly provides that expenses are non-concurrent by stating that the reinsurance is "subject to" the stated limits. The Global Experts also stressed that just because the Payments Provision states that certain expenses must be paid on a proportional basis does not mean those expenses are not capped.

In contrast, the Century Experts contended that the Preamble and its phrase "subject to" do not refer solely to the terms, conditions and limits stated on the reinsurance certificate, but instead to all of the terms, conditions and limits governing the integrated reinsurance agreement -- i.e., also the terms of the underlying Century Policies, including the Supplementary Payments provision, which states that the insurer must pay expenses in addition to the limit of liability. The Century Experts also testified that the two dollar amounts stated in Item 4 establish a ratio, which knowledgeable members of the reinsurance industry would recognize due to the phrase "part of."

### D.  This Matter

In the late 1980's, Caterpillar began to be sued for bodily injury allegedly resulting from asbestos-containing products manufactured by Caterpillar. In 2001, Caterpillar requested coverage and the defense of these asbestos claims under the Century Policies. As a result of litigation and related settlements, Century became obligated to reimburse Caterpillar for certain amounts it paid as damages to asbestos claimants (*i.e.*, losses) and amounts for defense costs Caterpillar had paid to defend itself against the asbestos claims (*i.e.*, expenses). Century subsequently took over the defense of asbestos claims against Caterpillar and continues to pay for losses to resolve claims against Caterpillar and expenses for defense costs related to those claims.

Beginning in 2012, Century billed Global for its proportionate share of indemnity plus its proportionate share of expenses associated with that indemnity. Through 2018, Global has paid up to and no greater than the amounts stated in Item 4 of the facultative certificates for both indemnity and expenses.

## III.    CONCLUSIONS OF LAW

### A.  The Integrated Agreement

To determine whether the reinsurance agreements are ambiguous, a threshold issue is to identify what the "fully integrated agreement" comprises. *Global IV*, 30 N.Y.3d at 519. Here, the Century Policies are integral to their respective reinsurance contracts.

The New York Court of Appeals cautioned in *Global IV*, "Courts should be mindful that a [reinsurance] certificate, while serving as written confirmation of a contract, might not in and of itself constitute the fully integrated agreement." *Id.* When a contract "does not contain a merger clause, the court must determine whether the agreement is integrated by reading the writing in light of surrounding circumstances." *Bourne v. Walt Disney Co.*, 68 F.3d 621, 627 (2d Cir. 1995) (internal quotation marks omitted) (applying New York law); *accord Olin Corp. v. Insur. Co. of N. Am.*, No. 84 Civ. 1968, 2016 WL 1048057, at *3 (S.D.N.Y. Mar. 11, 2016).

The reinsurance certificates reference and incorporate the underlying policies they cover. The Preamble states that "the Reinsurer does herby reinsure the ceding company . . . in respect of the Company's policy(ies) as follows[.]" The Following Form Clause states "the liability of the Reinsurer, as specified in Item 4 . . . shall follow that of the [ceding company] and shall be subject in all respects to all the terms and conditions of the Company's policy except when otherwise specifically provided herein[.]" The Payments Provision states that "[a]ll loss settlements made by the [ceding company are] . . . binding on the reinsurer[,]" "provided [the

loss settlements] are within the terms and conditions of the original policy(ies)." Moreover, at the evidentiary hearing, the parties agreed that the Century Policies are integral to the reinsurance contracts. Accordingly, the Century Policies are part of the integrated reinsurance agreements and may be reviewed in determining whether the contract as a whole is ambiguous as to the issue in dispute.

### B. Standard

"The interpretation of the certificates at issue here is a question of New York law[.]" *Global III*, 843 F.3d at 127. The New York Court of Appeals has stated that "[r]einsurance contracts are governed by the same principles that govern contracts generally." *Global IV*, 30 N.Y.3d at 518. A court must enforce a contract that is "complete, clear and unambiguous on its face . . . according to the plain meaning of its terms." *Id.* In other words, under New York law, "'[i]f the contract is unambiguous, its meaning is . . . a question of law for the court to decide.'" *Lepore v. Hartford Life Ins. Co.*, No. 29 Civ. 778, 2020 WL 598539, at *2 (2d Cir. Feb. 7, 2020) (summary order) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009)). But if a contract's meaning is ambiguous, then the finder of fact also looks to the surrounding circumstances to determine the parties' intent. *Global IV*, 30 N.Y.3d at 517 ("Reinsurance, like any other contract, depends upon the intention of the parties, to be gathered from the words used, taking into account, when the meaning is doubtful, the surrounding circumstances."). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *Sigmon, Trustee for Hindin v. Goldman Sachs Mortg. Co.*, 2020 WL 556346, at *1 (2d Cir. Feb. 4, 2020) (summary order) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002)).

Whether a contract is ambiguous is a question of law for the court. *Id. See also Lend Lease (US) Const. LMB Inc. v. Zurich American Ins. Co.*, 28 N.Y.3d 675, 681-82 (2017).

"Above all else," courts must "look to the language of the policy" to determine its meaning. *Global IV,* 30 N.Y.3d at 518. A court must ascertain ambiguity "by reading the terms of the agreement, not in isolation, but as a whole," *id.* at 519, so that "every part [is] interpreted with reference to the whole." *Id* at 518. A contract must not be interpreted "as impliedly stating something which the parties have neglected to specifically include," particularly when sophisticated, counseled parties negotiated the agreement at arm's length. *Id* at 518-19. The Court may not rely on its "own familiar notions of economic efficiency" when determining whether a contract is ambiguous. *Id.* at 519 (Courts may not impute ambiguity "to reflect [its] personal notions of fairness and equity" "[i]f [the] contract is reasonably susceptible of only one meaning"). It is also "axiomatic that courts construing contracts must give specific terms and exact terms . . . greater weight than general language." *Cty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) (internal quotation marks omitted) (construing New York law); *accord Deutsche Mexico Holdings S.a.r.l. v. Accendo Banco, S.A.*, No. 19 Civ. 8692, 2019 WL 5257995, at *4 n.1 (S.D.N.Y. Oct. 17, 2019); *see also Cronos Grp. Ltd v. XComIP, LLC*, 156 A.D.3d 54, 61, 64 N.Y.S.3d 180 (1st Dep't 2017) ("Where there is an inconsistency between a specific provision and a general provision in a contract, the specific provision controls.").

To determine whether a contract is ambiguous under New York law, a court must adopt the objective point of view of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Comm. Corp.*, 830 F.3d 152, 157 (2d Cir. 2016). "Evidence as to . . . custom and usage [in a particular industry] is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized." *Law Debenture Trust Co. of NY v.*

*Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (interpreting New York contract law); *accord Sompo Japan Ins. Co.*, 762 F.3d at 180 ("Terms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry."). "Proof of custom and usage does not mean proof of the parties' subjective intent, for extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *Law Debenture Trust*, 595 F.3d at 466 (internal quotation marks and alteration omitted). Instead, proof of custom and usage means proof that "the meaning of the term in question was general, uniform and unvarying." *Law Debenture*, 595 F.3d at 466 (citing *Belasco Theatre Corp. v. Jelin Prods.*, 59 N.Y.S.2d 42, 45 (1st Dep't 1945)). As long as the custom and usage was sufficiently well settled, uniformly acted upon and long continued "to raise a fair presumption that it was known to both contracting parties," then the specialized meaning may be used to interpret the agreement. *See Reuters Ltd. v. Dow Jones Telerate, Inc.*, 231 A.D.2d 337, 343, 662 N.Y.S.2D 450 (1st Dep't 1997).

Here, to determine whether a reinsurance agreement is ambiguous the relevant inquiry is whether "its terms could suggest more than one meaning to a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the" reinsurance and insurance industries in the 1970's. *See Orchard Hill Master Fund Ltd.,* 830 F.3d at 156-57.

### C. Analysis

The Second Circuit directed this Court to "construe each reinsurance policy solely in light of its language, and to the extent helpful, specific context." *Global V*, 890 F.3d at 77. The parties agree that the reinsurance agreements are unambiguous but disagree as to their meaning.

Both parties overstate their argument, as both parties ignore or misconstrue the explicit text in the reinsurance contracts.

The plain and unambiguous meaning of the reinsurance contracts is that the dollar amount stated in Item 4 caps Global's obligation to pay losses and also caps Global's obligation to pay expenses when there are no losses, but does not cap Global's obligation to pay expenses when there are losses. This interpretation is based on the "language of the policy," *see id*., after having read the contract as a whole and with reference to the "customs, practices, usages and terminology understood in the" reinsurance industry in the 1970's as explained below. *Orchard Hill Master Fund Ltd.,* 830 F.3d at 156-57.

The Following Form Clause states that Global's liability is "subject in all respects to all the terms and conditions of the Company's policy." "[A]ll the terms and conditions" includes the Supplementary Payments provision in the Century Policies, which states that the insurer must pay expenses in addition to the limit of liability. In other words, defense costs do not erode the policy limits. The Following Form Clause therefore does not refer only to the types of risks that the insurance covers, as Global contends, but instead expressly refers to "all the terms and conditions."

The Following Form Clause also states that the reinsurance is subject to the underlying Century Policy's terms and conditions "except when otherwise specifically provided herein." The Payments Provision specifically provides what the reinsurer must pay and in what amounts, thus modifying as to the reinsurer the Century Policy's terms and conditions. The Payments Provision states that the reinsurer, Global, must pay "[a]ll loss settlements made by the Company [Century]" and "its proportion of" expenses. The provision further defines which loss

settlements and which expenses are payable. These definitions are not at issue here, and the parties agree that expenses include defense costs.

The Payments Provision directs how much the reinsurer must pay for losses and expenses respectively. As to losses, the second sentence states that the reinsurer must pay "its proportion of each loss as set forth in the Declarations." The referenced reinsurer's proportion of loss is set forth in Item 4 of the Declarations, which is titled "Reinsurance Accepted." Thus, the Payments Provision (second sentence) and Declarations (Item 4) together dictate two things -- first, the reinsurer's "proportion" of loss -- i.e., how to calculate the insurer's share of loss; and second, the maximum amount of such loss. For example, where the reinsurer participates up to $1 million in a $10 million layer, after lower layers amounting to $5 million are exhausted ($1 million "part of" $10 million excess $5 million), the reinsurer's proportion of the loss is 10% of any loss between $5 million and $15 million.[5] The reinsurer's maximum amount of loss is thus $1 million. The parties do not dispute that Item 4 caps the reinsurer's obligation to pay indemnity in this way.[6]

The third sentence of the Payments Provision addresses the amount of expense the reinsurer must pay when there *is* a loss, which appears to be the case here based on the parties' stipulated facts. The fourth sentence addresses the amount of expense the reinsurer must pay when there is *no* loss. In the interest of reading the contract as a whole, it is useful to parse and contrast these two provisions.

---

[5] In this example, if the insurer paid a total loss of $6 million, the reinsurer would pay a loss amount of 10% of $1 million, *i.e.*, $100,000.

[6] The first two sentences of the Payments Provision state: "All loss settlements made by the Company, provided they are within the terms and conditions of the original policy(ies) and within the terms and conditions of this certificate of reinsurance, shall be binding on the Reinsurer. Upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of each loss as set forth in the Declarations."

The fourth sentence of the Payments Provision determines the amount of the reinsurer's obligation to pay expenses when there are no losses, *i.e.*, when the reinsurer makes no loss payment. This provision, like the second sentence of the Payments Provision just discussed, expressly departs from the terms and conditions of the underlying Century Policy. The fourth sentence states:

> If there is no loss payment, the Reinsurer shall pay its *proportion* of such expenses only in respect of business accepted on a contributing excess basis and then *only in the percentage* stated in Item 4 of the declarations in the first layer of participation.

(Emphasis added). This provision, like the second sentence of the Payments Provision just discussed, coupled with Item 4 of the Declarations, dictates two things when there is no loss payment: First, the reinsurer's "proportion" of expenses -- *i.e.*, how to calculate the reinsurer's share of expenses; and second, the maximum amount of such expenses. The operative language is that the "Reinsurer shall pay its proportion of . . . expenses in the percentage stated in Item 4 in the first layer of participation."[7]

Literally read, Item 4 contains only a dollar amount. But Item 4 also contains an implied percentage of the reinsurer's proportionate share of the relevant layer of reinsurance. The Century Experts confirmed this construction -- in particular, through credible testimony that the term "part of" in the Declarations signifies to knowledgeable members of the 1970's reinsurance industry that the dollar amounts create a ratio. Using the same example above -- $1 million "part of" $10 million excess $5 million -- the applicable percentage is 10% of every expense dollar in

---

[7] The phrase, "in respect of business accepted on a contributing excess basis," is not at issue here. The Century Experts explained, and Global did not dispute, that "contributing excess basis" refers to the fact that the reinsurer in question is one of several reinsurers on an excess layer. As for "business accepted," one of Century's experts, Mr. Hall, explained that a reinsurer might insist on non-concurrent exclusions in the reinsurance, such as a pollution exclusion in the reinsurance that was not present in the underlying insurance policy.

excess of $5 million, up to a total excess of $10 million. The language "in the first layer of participation" clarifies that the percentage in the example is 10% of $10 million (*i.e.,* the size of the first layer of participation), and not, for example, 10% of the total amount of expenses.[8] By definition and as expressly stated in Item 4, the maximum amount is $1 million.

The amount of expenses that Global must pay is therefore limited when there are no loss payments, and the cap is the same dollar amount that limits the indemnity payments. The Payments Provision therefore contains a second explicit exception to the Following Form Clause. Century's argument that the reinsurance contracts do not cap any expenses is unpersuasive for two reasons. First, it does not address this fourth sentence, and thus fails to read the agreement "as a whole." *Global IV,* 30 N.Y.3d at 518. Second, it is internally inconsistent, interpreting the reference to Item 4 one way for loss indemnification, and another way for expense reimbursement when there are no losses.

Finally, the provision that governs the question here is the third sentence of the Payments Provision. Like the second and fourth sentences discussed above, the third sentence prescribes the reinsurer's "proportion" of expenses, this time when the reinsurer has loss payments. But the third sentence does not contain a cap on the reinsurer's liability for such expenses, by reference to Item 4 or otherwise. Unlike the other sentences, the third sentence does not include explicit language that excepts it from the Following Form Clause as to the amount of expense payments when there are loss payments. The third sentence states:

---

[8] Moreover, the percentage cannot be 10% of every dollar of expense (derived from $1 million part of $10 million), as that interpretation would mean that the reinsurers in a single layer are responsible for 100% of the defense payments, leaving the lower and upper layers either with no responsibility or duplicative responsibility. *See InterDigital Comm's Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 530 (S.D.N.Y. 2005) ("It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical").

> In addition thereto [*i.e.*, the Reinsurer's share of the loss payment], the Reinsurer shall pay its *proportion* of expenses . . . incurred by the Company in the investigation and settlement of claims or suits and its *proportion* of court costs and interest on any judgment or award, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment.

This sentence directs Global to pay Century for expenses (when the Reinsurer has loss payments) based on a proportionate share of losses.  Global's share is measured as the ratio of the Reinsurer's loss payment to the Company's gross loss payment.  Using the same example above -- $1 million "part of" $10 million excess $5 million -- if Century's gross loss payment is $15 million, then Global's loss payment is $1 million.  The ratio of the reinsurer's loss payment ($1 million) to the company's gross loss payment ($15 million) is 1 to 15, or 6.7%.  The third sentence does not limit the expense costs that Global owes by reference to a limit or dollar amount stated in the certificate, and the sentence should not be construed as "impliedly stating" such a limit.  *See Global IV*, N.Y.3d at 519.  Therefore, this clause must "follow" the underlying insurance as to the payment of expenses, which means that these expenses must be paid in addition to, and are not capped by, the liability limit.

Global's principal argument to the contrary is that the Preamble's "subject to" language cabins the terms and conditions that follow -- in effect giving precedence to Item 4 of the Declarations and its dollar limit -- and interpreting everything that follows as subject to that limit.  The language of the reinsurance contracts and principles of contract construction undermine that argument.  Moreover, the credible testimony from the Century Experts confirms that Global's construction is incorrect.

The Preamble introduces and prefaces the facultative certificate's terms and conditions, and contains the general agreement to reinsure:

> In consideration of the payment of the premium, and subject to the terms, conditions and limits of liability set forth herein and in the Declarations made a part thereof, the Reinsurer [Global] does hereby reinsure the ceding company [Century] named

in the Declarations (herein called the Company) in respect of the Company's policy(ies) as follows:

This brief and general language is by its own terms an introduction to the more specific terms and conditions, such as the Following Form Clause and Payments Provision. This prefatory language is insufficiently detailed or explicit to override the Payments Provision's specific directives as to expenses when there are loss payments and when there are no loss payments. "It is axiomatic that courts construing contracts must give specific terms and exact terms . . . greater weight than general language." *County of Suffolk*, 266 F.3d at 139 (internal quotation marks omitted) (construing New York law); *accord Deutsche Mexico Holdings S.a.r.l.*, 2019 WL 5257995, at *4 n.1.

The text of the reinsurance agreements suggests that evidence of non-concurrency would be explicitly stated. For example, most of the facultative certificates at issue include an option to select the "Basis of Acceptance" as "Non-Concurrent" under Item 5 of the Declarations. That option is not selected on any of the certificates in this case, meaning that the reinsurance and underlying insurance are concurrent, except where the contracts state otherwise.

This textual interpretation is confirmed by the credible expert testimony regarding the relevant industry custom and practice. The Court credits the Century Experts' testimony that concurrency was significant enough to the history of reinsurance and to the reinsurance market that parties to reinsurance agreements considered whether the reinsurance and insurance should be concurrent when drafting contracts. The Court also credits the Century Experts' testimony that concurrency was presumed, unless the policy contained an explicit statement of non-concurrency. While the Court also accepts the Global Experts' testimony that other considerations mattered to the parties, these concerns do not preclude that the parties also had to address the important issue of whether to explicitly draft non-concurrency into the agreement.

The Century Experts offer more than enough credible evidence "to raise a fair presumption" that these principles of concurrency were part of the reinsurance industry's customs and practices in the 1970's. *Reuters Ltd.*, 231 A.D.2d at 344. Just as a knowledgeable member of the 1970's reinsurance industry would expect material terms like the types of risks covered and the indemnity limit to be expressly stated in the agreement, a knowledgeable insurer or reinsurer would also expect any non-concurrency as to expenses also to be expressly stated.

In this case, non-concurrency is expressly stated as to expenses when there are no losses. No such express statement is made as to expenses when there are losses. Therefore, in this case, based on the reinsurance language and industry customs and practices in the 1970's elucidated through credible testimony, when there are losses, the reinsurer's liability as to expenses is not capped by any dollar amount, although the amount is limited and calculated by a ratio in the certificate.

Finally, Global argues that Second Circuit and New York Court of Appeals precedent requires that Item 4 cap indemnity and expenses. None of the cases cited, however, require such a result. The Second Circuit's instruction in *Global III* that *Bellefonte* and *Unigard* are "worthy of reflection" convinces this Court that even if these decisions have not been overruled, their continued applicability may be scrutinized. *See Global III*, 843 F.3d at 126. The Court is also mindful that its prior decision made in reliance on these two cases was reversed by the Court of Appeals, which is why we are here now. *See Global V*, 890 F.3d at 77 ("Though reasonable in light of our reasoning in *Bellefonte* and *Unigard*, it is now clear that the district court's determination that the contract was unambiguous was premised on an erroneous interpretation of New York state law."). On remand, this Court was directed to "construe each reinsurance policy solely in light of its language and, to the extent helpful, specific context." *Id.*

The Court does not follow *Excess Ins. Co.* for a similar reason. *See Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577 (N.Y. 2004). In *Excess*, the New York Court of Appeals held that it "follow[ed] the decisions of . . . the Second Circuit in [*Bellefonte*] and [*Unigard*]." *Id.* at 583. The question the Second Circuit certified to the Court of Appeals was whether "the decision of the New York Court of Appeals in *Excess* . . . impose[s] either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs?" *Global III,* 843 F.3d at 122. The Court of Appeals answered unequivocally no: "*Excess* did not supersede the standard rules of contract interpretation." *Global IV*, 30 N.Y.3d at 518.

As *Global III*, *IV*, and *V* cast doubt on *Bellefonte* and *Unigard*, this Court has followed the directive to use "the traditional rules of contract interpretation" to construe Global's reinsurance agreements. *Global IV*, 30 N.Y.3d at 518; *Global V*, 890 F.3d at 77.

The remaining three cases that Global cites are distinguishable because their contracts included different language from the reinsurance contracts here. *See Global IV*, N.Y.3d at 518 (instructing that "above all else," courts must "look to the language of the policy" to determine its meaning). The reinsurance contract in *Munich Re* included language expressly providing that the amount stated in the Declarations caps indemnity. *See Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 594 F. App'x 700, 703 (2d Cir. 2014) (summary order) (noting that the contract states: "[t]he Reinsurer agrees to indemnify the Company against losses or damages . . . subject to the reinsurance limits shown in the Declarations" (alterations omitted). And the reinsurance contracts in *R&Q* provided that the reinsurer's obligation is "subject to the terms hereon and the general conditions." *See Utica Mut. Ins. Co. v. R&Q Reinsurance Co.*, No. 13

Civ. 1332, 2015 WL 4254074, at *8 (N.D.N.Y. June 4, 2015). The Courts in both *Munich Re* and *R&Q* held that the contract language in those cases is not similar to the certificates in *Bellefonte*, which is "nearly identical" to the contract language here. *See Global I*, 2014 WL 4054260, at *5 ("Here, the relevant language in Global's Certificates is nearly identical to the language relied on by the Second Circuit in *Bellefonte*."); *Munich Re*, 594 F. App'x at 704 (stating that *Bellefonte* and *Unigard* "interpreted different policies than the one at issue in this case"); *R&Q*, 2015 WL 4254074, at *8 ("[T]he preamble to the Certificate here, unlike the preamble in *Bellefonte* and *Unigard*, does not expressly make the reinsurer's obligations 'subject to' the reinsurer's 'amount of liability'"). Those decisions, moreover, were not decided with the aid of credible testimony regarding industry custom and practice.

The contracts in *Clearwater* also contain different language from the contracts here, and also were decided without the aid of industry custom and practice. The *Clearwater* certificates stated: "[u]pon receipt by [Clearwater, the reinsurer], of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, [Clearwater] shall promptly reimburse [Utica, the insured] for its share of the loss and loss expense." *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 17 (2d Cir. 2018) (some alterations in original). The terms dictating the payment of losses and expenses in the *Clearwater* reinsurance contracts are therefore substantially different from the terms of the Payments Provision, which express different payment directions for losses, expenses when there are losses, and expenses when there are no losses. The *Clearwater* Court also acknowledged, following *Global IV*, that a reinsurance

contract's meaning must be determined "from the words used," and the words in *Clearwater* are not the same as the words here.  *Id*. at 18 (quoting *Global IV*, N.Y.3d at 518).[9]

## IV.    CONCLUSION

For the reasons stated above, the Court DECLARES that the plain and unambiguous meaning of the reinsurance contracts at issue in this case is that Item 4 caps losses, and also caps expenses when there are no losses, but does not cap expenses when there are losses.  Global's request for declaratory relief is DENIED.  The Court of Clerk is respectfully directed to close this matter.


SO ORDERED
Dated: March 2, 2020
         New York, New York


                                    LORNA G. SCHOFIELD
                                UNITED STATES DISTRICT JUDGE

---

[9] Accordingly, the *dicta* in *Clearwater* -- suggesting that the indemnity limit would also cap expenses if the reinsurance was "subject to" the amount of liability -- cannot be treated as a general statement about reinsurance contract construction.  *See Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 19 (2d Cir. 2018).  The instant case, after seven years and now on its sixth published opinion, is still unresolved because it was unclear to what degree the contract could be interpreted as written.  It is now clear that "[p]rinciples of contract interpretation guide the way in determining" the meaning of these reinsurance agreements, and that means "the words used" must guide the way as well.  *Id*. at 18.